489 P.2d 44

**The STATE of Arizona, Appellee,**

v.

**Lynn SAMPLE, Appellant.**

**No. 2215.**

Supreme Court of Arizona,
In Division.

Sept. 28, 1971.

Rehearing Denied Oct. 27, 1971.

Robert R. Bean, Pinal County Atty., by David Ochoa, Deputy County Atty., Florence, for appellee.

Karman & Brumage, by Lloyd D. Brumage, Casa Grande, for appellant.

CAMERON, Justice.

Lynn Sample was charged with the murder of his wife and convicted by a jury of aggravated assault. From the judgment of guilt to the assault and of a prior conviction, as well as a sentence of not less than nine nor more than ten years, defendant appeals.

We are called upon to determine:

1. Did the trial court commit error in admitting certain statements and a confession made by appellant?

2. Was the search of appellant's premises illegal?

3. Was the record of appellant's previous conviction constitutionally in-

firm, thereby rendering appellant's sentence excessive.

4. Was it error for the trial court to deny appellant's motion to prevent the County Attorney from using the invalid conviction for impeachment purposes?

The facts of the case are as follows. Patsy Sample was found dead in the bedroom of her mobile home on the 15th day of February 1970. The body showed signs of a severe beating, i. e. multiple contusions and lacerations about the head, face, legs, back, and arm areas. Medical testimony established the cause of death as a perforation in the intestinal wall with its resultant hemorrhaging and infection. The perforation, resulting from a rapid compacting of the intestine causing trapped air and bursting, was placed in time, by an autopsy, as having occurred between 8 P.M. on the 13th and 8 P.M. on the 14th. Testimony of a friend revealed that the victim was last seen alive at 10 A.M. on the 14th at which time she complained of severe abdominal pain. This prosecution and verdict followed.

## ADMISSION OF THE STATEMENTS

Chief of Police Guy Hill of the Mammoth Police Department was the first officer on the scene. He was summoned to the trailer by Mrs. Serna after Mr. Sample went to her for help. Upon his arrival, Mr. Sample spontaneously exclaimed, "My God, I killed my wife." A quick check of the bedroom revealed the corpse. Chief Hill immediately placed his suspect under arrest and read him the "Miranda" card. He placed the defendant in the car and forthwith drove to the station. Upon arrival at the station, Chief Hill again read the defendant his rights. Mr. Sample indicated a willingness to talk, but no extensive interrogation took place. Chief Hill's only inquiry was what had made the marks on her body. The defendant indicated they were made by a belt, a fact which he has never denied.

At 2:00 o'clock that afternoon the defendant was arraigned. The Justice of the Peace testified as follows:

"Q You advised him of the right—that he had a right to have a court appointed attorney if he couldn't afford one?

"A I did.

"Q Did he indicate to you that he wanted an attorney?

"A At that time he was shaken and crying so hard that I advised him that we would try to get an attorney appointed for him before we made any further proceedings with it.

"Q You then undertook to get an attorney appointed for him?

"A Yes."

At 5 P.M. on the same day, defendant requested and was allowed, after re-warning and the signing of a waiver form, to make a statement which statement was reduced to writing. The defendant subsequently moved to suppress the statement concerning the belt and the written statement, which motion was denied.

It is true that the evidence establishes that the defendant was nervous and upset —at times seriously so. However, at no time did either the police or the court seek the advantage of the moment. He was neither extensively interrogated nor requested to enter a plea in his moments of stress.

An examination of the record sustains the finding of the lower court at the voluntariness hearing, to wit: the statements were voluntary and admissible. The record reveals all the manifest indicia of comprehension of his rights, waiver thereof, and a continuing desire to make a statement. We do not have to plumb the depths of the defendant's mind to determine ab initio the issue of voluntariness. The police, as reasonable men, may rely on consistent objective manifestations of consent and waiver by a suspect. There is nothing inherently inconsistent between the defendant's condition, which we are sure to a large extent is universal under the circum-

stances, and valid waiver. As the trial court noted:

"I believe a fair resume of the testimony is that the defendant's condition remained nervous and upset throughout the day. However, again I believe the defendant was aware he was at the police station, that he was in custody. And I believe that both of these statements are voluntary and will be admitted."

Similarly, we are convinced that the post-arraignment statement was voluntarily made. As Chief Hill testified:·

"* * * [H]e asked me if I was going to let him make a statement, and I told him if he wanted to make a statement at this time, that I would let him make a statement."

The fact that it was made without notification to or with the permission of appointed counsel is of no consequence under the facts of this case. State ex rel. Berger v. Superior Court, 105 Ariz. 553, 468 P.2d 580 (1970); cf. Reinke v. United States, 405 F.2d 228 (9th Cir. 1968). Under such circumstances, the written statement was admissible.

## SEARCH AND SEIZURE

The search complained of occurred after Mr. Sample was taken to the police station. Chief Hill, after arresting the defendant and placing him in custody, returned to the mobile home and, without a warrant, searched the premises and seized several items. This was about two hours later. Primarily the items consisted of the belt found on the floor, the buckle found on the dresser, a sheet from the bed, two pillow cases, a bowl found on the bedroom floor, a liquor bottle found in a waste basket, and several miscellaneous items. A motion to suppress was argued and denied.

This was not a search incident to a lawful arrest, as the defendant was already under arrest and in custody. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Nor is it supported by "exigent" circumstances or the necessity of preserving destructible evidence. But see Stevens v. State (Alaska), 443 P.2d 600 (1968). The evidence is also clear that a magistrate was available and that Chief Hill could have easily obtained a search warrant before returning to the mobile home.

▮ We believe that the warrantless search was nonetheless permissible and the fruits of the search admissible against the defendant. We find nothing in the Constitution or common sense which should prevent the police from making a warrantless search of the premises in which the victim is found dead and this is true even if the suspect exercised joint control of said premises along with the victim.

The United States Supreme Court has stated:

"The Fourth Amendment provides that, 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against *arbitrary* invasions by governmental officials. The Fourth Amendment thus gives concrete expression to a right of the people which 'is basic to a free society.' Wolf v. People of State of Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 [1785]. As such, the Fourth Amendment is enforceable against the States through the Fourteenth Amendment. Ker v. State of California, 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 [735]." Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967). (Emphasis added.)

"Thus, although '[t]he recurring questions of the reasonableness of searches' depend upon 'the facts and circumstances

—the total atmosphere of the case,' *id.,* [United States v. Rabinowitz, 339 U.S. 56] at 63, 66, 70 S.Ct., [430] at 434, 435, [94 L.Ed. 653, at 659, 660] (opinion of the Court), those facts and circumstances must be viewed in the light of established Fourth Amendment principles." Chimel v. California, supra at 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685, 695.

Reviewing the facts and circumstances in this case, "the total atmosphere", we are convinced that the search was reasonable within the framework of the Fourth Amendment and the historical reasons for its existence. The traditional right of citizens to be free from unreasonable searches and seizures and unreasonable and unnecessary invasions of their privacy is not violated when the premises upon which a deceased victim is found are searched without a warrant. The need for all citizens and particularly potential victims such as this to effective protection from crime, particularly while in their own home, would indicate that a warrantless search of the premises is not made unreasonable or unconstitutional by the fact that the defendant exercises joint control over the premises. So much of the opinion in State v. Lenahan, 12 Ariz.App. 446, 471 P.2d 748 (1970) which is to the contrary is reversed.

## PRIOR CONVICTION

The defendant was previously convicted in 1953 in Texas of murder with malice. The prosecution alleged the prior conviction and the jury found it to be true as alleged. Enhanced punishment was levied under § 13–1650 A.R.S. (as amended) which reads in part as follows:

"A. A person who has been *convicted* in any court without this state of an offense which, if committed within this state, would be punishable by the laws of this state * * * shall be punished for any subsequent crime committed within this state in the manner prescribed by 13–1649 * * *." (Emphasis added.)

§ 13–1649 A.R.S., as applicable to this case, provides for an enhanced punishment not to exceed ten years in the state prison.

The record reveals that the defendant was represented by counsel at his previous trial but that he was not so represented at his sentencing. Therefore, he contends that the conviction was constitutionally infirm and cannot properly serve as the basis for enhanced punishment. We cannot concur. It is uncontroverted that a criminal defendant has a right to counsel guaranteed by the Sixth Amendment, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and that extends to all critical stages, Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), including sentencing. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); Lee v. State, 99 Ariz. 269, 408 P.2d 408 (1966). As noted in the Martin case, however, lack of counsel at the sentencing invalidates only the sentence imposed. Martin v. Eyman, 102 Ariz. 341, 429 P.2d 660 (1967). The integrity of the verdict and the judgment of guilt or conviction is not thereby destroyed.

Defendant's prior conviction was constitutionally sound, cf. State v. Silva, 78 N.M. 286, 430 P.2d 783 (1967); Dallas v. State (Fla.App.), 229 So.2d 891 (1969); People v. Tiner, 11 Cal.App.3d 428, 89 Cal.Rptr. 834 (1970), and could be used to enhance the punishment under § 13–1650 A.R.S.

## IMPEACHMENT

Defendant argues, that, if the conviction was infirm, it was improper for the trial court to deny his motion to prevent impeachment by the prior felony conviction when the defendant took the stand to testify. Having held the conviction itself to be sound, we hold that impeachment would be possible and that the trial court did not err in denying the motion. For the general rule on impeachment on cross-examination by the showing of prior felony conviction

see State v. Sorrell, 85 Ariz. 173, 333 P.2d 1081 (1959); State v. Johnson, 99 Ariz. 52, 406 P.2d 403 (1965); State v. Enriquez, 102 Ariz. 402, 430 P.2d 422 (1967).

Judgment affirmed.

STRUCKMEYER, C. J., and LOCK-WOOD, J., concur.