Filed 9/22/22  Marriage of Mary and Randall A. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re Marriage of MARY and RANDALL A. | B314768 |
| | (Los Angeles County Super. Ct. No. 21CHFL00548) |
| MARY M. A., | |
| Respondent, | |
| v. | |
| RANDALL M. A., | |
| Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael J. Convey, Judge.  Affirmed.

Randall M. A., in pro. per.; and Jonathan Lee Borsuk, for Appellant.  [*Retained*.]

Law Offices of Kathryn Irene Phillips and Kathryn Irene Phillips, for Respondent.

_____

Appellant Randall M. A. (Randall) appeals two orders entered on the same day. The first grants a domestic violence restraining order (DVRO) in favor of respondent Mary M. A. (Mary) against Randall. The second denies Randall's request for a DVRO against Mary. Randall argues the superior court abused its discretion by excluding video evidence and by asking Mary questions during the hearing. He further argues the court committed prejudicial error by failing to issue a statement of decision. Finally, Randall contends the statutory scheme for DVROs is unconstitutionally vague. Finding no reversible error, we affirm.

## BACKGROUND

This is a marital dissolution action. Randall and Mary married in 2013. They have two children, Ethan and Emma, who were six and two years old respectively at the time of the hearing on the DVRO requests.

Long before the events that led to this action, Randall committed physical violence against Mary on two occasions. In 2015, Randall stepped on her ribs and shattered her cell phone into pieces. In 2017, he headbutted her. While Randall and Mary have had marital problems from the beginning, the discord in their relationship accelerated in 2019 after their family home burned down.

By 2020, Randall was regularly sending belligerent and often profane text messages to Mary. In these texts, for example, he called her a "pathetic cunt" and a "fake bitch lying disgusting manipulative piece of trash." Randall also threatened to wage a "war" on Mary that she would "never forget" and warned she would "regret" dodging her responsibilities.

Randall frequently called and texted Mary to ask her where she was and what she was doing. Mary believed this was an effort to control her. In response to Randall's controlling and abusive behavior, Mary often stopped communicating with him. This further enraged Randall and was the topic of many of his hostile communications. He frequently told Mary she was "going to pay" for not responding to him. Randall also sent many texts to the couple's friends and family complaining that Mary refused to see or talk to him.

Randall is a lawyer with a personal injury and civil litigation practice. Beginning in 2020, Mary became increasingly dependent on Randall to support her financially. In that year, Randall "demolished" the website of Mary's cosmetics sales business by deleting the data she kept for eight years. While Randall continued to pay for the children's school expenses and most of the costs of their family home, he did not provide Mary with any funds. In March 2021, she stopped working and started collecting unemployment benefits. By August 2021, when the hearing on the parties' respective DVRO requests was held, Mary had no money left in any bank account she controlled.

Randall engaged in many other acts that Mary perceived as harassing and controlling. He sometimes locked the control of the thermostat of the family home and changed the temperature so that it was very hot or cold. He changed the locks inside the home and denied Mary access to certain rooms. He cut off Wi-Fi access from time to time. On one occasion he placed a fake cockroach on the pillows of Mary's bed.

Underlying much of the tension in the marriage was Mary's concern over Randall's drug abuse and possession of guns. Randall carried a briefcase with him everywhere he went and

sometimes left it in the residence in places where the children had access to it.  According to Mary, Randall kept illicit drugs and a pistol in the briefcase.  Randall also frequently displayed his gun collection, which consisted of over 10 weapons.  Randall denies using illicit drugs.  But he does not deny his frequent display of guns or deny that in 2001 he pleaded guilty to criminal threats after displaying a weapon to his neighbors.

On October 22, 2020, during an argument, Randall grabbed Mary's arm and shoved her against the wall.  Mary called the police but Randall was apparently not arrested.

On April 6, 2021, Randall repeatedly telephoned Mary but she declined to answer.  Randall then contacted the couple's daughter Emma by Facetime on her iPad.  When Mary took the iPad from Emma, Randall shouted, "Cover Emma's ears."

Mary then "heard loud clicks such as a gun makes when a shell is put into its chamber" and saw Randall hold a gun to his head.  While aiming a gun at himself, Randall told Mary, "The next time when I'm calling you better answer."  Mary took a screenshot of Randall holding a gun to his head.

On April 7, 2021, Randall locked Mary and the children out of the family home by placing screws in the locks on the house.  A neighbor helped Mary get back into the house about 30 minutes later.

A week later, on April 14, 2021, Mary filed a petition for dissolution.  Shortly thereafter, the parties filed their respective requests for a DVRO.

On May 19, 2021, the superior court issued a temporary restraining order (TRO) against Randall.  Until the hearing on Mary's request for a DVRO, the TRO prohibited Randall from contacting Mary directly or indirectly except for purposes of

4

limited child visitation. Randall did not comply with this order. After the TRO was served on Randall and prior to the DVRO hearing, Randall texted Mary 20-30 times regarding issues wholly unrelated to the children. This made Mary feel fearful and anxious.

The court held a hearing on the parties' DVRO requests on August 10 and 11, 2021. At the conclusion of the hearing, the court orally announced its rulings and entered written orders granting a DVRO against Randall and denying a DVRO against Mary.

Randall filed a timely notice of appeal of the orders.

## STANDARD OF REVIEW

The standard of review of an order granting or denying a DVRO is abuse of discretion. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495.) The same standard applies to an order excluding evidence. (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885.)

Under this standard, "[b]road deference must be shown to the trial judge. The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." [Citation.]' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) A trial court abuses its discretion only when it makes an " ' "arbitrary, capricious, or patently absurd determination." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

With respect to a question of law—such as whether the trial court was required to issue a statement of decision and whether the DVRO statutes are constitutional—we review the

5

issue de novo.  (*People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445.)

Even if we find error, we cannot reverse the trial court's order unless we also conclude there was a miscarriage of justice. (Cal. Const., art. VI, § 13; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1102 [holding the trial court's failure to provide a statement of decision was not reversible per se and is subject to harmless error review].)  This means the appellant must show it was reasonably probable that a result more favorable to the appellant would have been reached in the absence of error.  (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195 [applying standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)]; *Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532–533 [noting the *Watson* standard "applies in both criminal and civil cases"].)

"On appeal, we review the correctness of the trial court's ruling, not its reasoning."  (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1049.)

## DISCUSSION

Before discussing Randall's arguments, a quick review of the relevant statutory scheme will help provide context.  Both parties sought a DVRO under the Domestic Violence Prevention Act, Family Code section 6200 et seq. (the Act).[1]  The Act permits people to obtain a DVRO when they are victims of "abuse" by certain individuals, including their spouses and parents. (§ 6211.)

---

[1]    Unless otherwise stated, statutory references are to the Family Code.

"Abuse" is broadly defined by statute and is not limited to physical violence. (§§ 6203, 6320; *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1425.) Abusive conduct includes, but is not limited to, harassment, threats, and conduct that disturbs the "peace of the other party" and "destroys the mental or emotional calm of the other party." (§ 6320, subds. (a) & (c).) In deciding whether to grant or deny a DVRO, the court must consider the totality of the circumstances. (§ 6301, subd. (c).)

The court cannot grant mutual restraining orders unless it makes " 'detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense.' " (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 368 (*Melissa G.*) [quoting § 6305, subd. (a)(2)].) In making this determination, the court must look at all the various incidents of alleged abuse between the parties and not make separate findings with respect to isolated events. (*Melissa G.*, at pp. 371–372; *K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 979 (*K. L.*).)

## I. The Trial Court Did Not Abuse its Discretion by Excluding Evidence or Questioning Mary

The trial court advised the parties that it had read and considered their written submissions and asked them for time estimates for live testimony. Mary estimated that she would need about 2.25 hours of time. Randall estimated he would need 10-25 minutes of live testimony, and an additional 30 minutes playing videos.

Although the court advised the parties they were bound by their time estimates and repeatedly tried to move the proceeding along, the hearing took much longer than expected. Near the end

7

of the second day, August 11, 2021, the court warned the parties that if they did not finish that day the next available date for a hearing was in April 2022.

## A.    *Exclusion of videotapes*

Evidence Code section 352 states the trial court has discretion to exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice."  Under this statute, the trial court enjoys "broad discretion" (*People v. Mills* (2010) 48 Cal.4th 158, 195) to limit cumulative evidence, especially on collateral issues (see *People v. Greenberger* (1997) 58 Cal.App.4th 298, 352; *Burke v. Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 774).

Randall contends the trial court abused its discretion by excluding various videos pursuant to Evidence Code section 352.

### 1.    *Video of October 22, 2020, incident*

As explained, Mary called the police on October 22, 2020, and claimed that Randall had physically assaulted her.  When the police arrived, Randall was lying on a couch.  Randall denies committing physical abuse on that day and claims he went straight to the couch to sleep when he came home.  Mary contends Randall was "fake sleeping" to avoid speaking to the police.

This was not an abuse of discretion.  Whether Randall was asleep *when Mary called the police* is a collateral issue at most.

Randall did not claim he had a video showing that he did not assault Mary.

Moreover, even assuming the court erroneously excluded the video, the court's ruling was not prejudicial. We have reviewed the video and it supports Mary's version of events. The video appears to be taken from a couch by a person who is not holding the camera still. If Randall were sleeping as he claimed, he could not have videotaped Mary.

2. *Videos of alleged service of TRO on October 23, 2020*

On October 23, 2020, Randall obtained a TRO in another action against Mary and went to their home to serve her with the order. During Randall's cross-examination of Mary on this topic, she denied that the police were present when Randall delivered the TRO. Randall then stated he had a video showing that the police were present at the time. The court responded: "So that doesn't show me anything other than the police were there. I will take it that the video shows that. I don't know that that impeaches here."

Randall did not clearly state that he sought to have the video admitted and the court did not unequivocally deny the admission of the video.

Shortly thereafter, Mary testified that Randall threw the papers at her when he served them. Randall and the court then had the following exchange:

"[Randall]: Your Honor, I have another video to establish that those papers were properly placed on the countertop while she was standing there.

"The Court: You'll testify to that under oath.

"[Randall]: I understand.

"The Court:  And I will tell you that that is not proper service.

"[Randall]:  I understand it's not proper service.  I did not throw them at her for sure.

"The Court:  Let's stop this arguing in front of me.

"[Randall]:  Understood.

"[Randall]  Okay.  We'll move on."

By not clearly moving these videos into evidence and obtaining a ruling by the court, Randall forfeited his argument on appeal that the videos should have been admitted.  (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1433.)

Assuming Randall requested to have these two videos admitted into evidence and the court denied his requests, the court did not abuse its discretion.  The manner and circumstances of the service of a TRO issued in another case was not relevant to the matters before the court.  At most these were collateral issues.  The court acted well within its discretion to exclude these videos as cumulative.

### 3. *Video of April 7, 2021, Incident*

As explained, Randall locked Mary and the children out of the family home on April 7, 2021, by placing screws in the locks of the house.  During cross-examination, Mary denied that she had access to the garage at that time.

Randall then stated to the court he had "video footage that shows that she had clear access to the garage and could have entered the property any time she wanted."  The court responded

10

by stating, "I will take your statement as true." Randall then moved on to another line of questioning.

Assuming Randall requested the admission of this video into evidence and the court denied his request, the court did not erroneously bar the video. The court acted within its discretion in excluding the video as cumulative evidence on a relatively collateral issue.

Even assuming the court erred in excluding the video, there was no miscarriage of justice. We have reviewed the video and while it shows the garage was open during an acrimonious encounter between the parties, it does not show the garage was open when the neighbor was helping Mary and the children into the house on April 7, 2021. The video had marginal probative value at most.

4. *Videos of Mary's alleged physical abuse of Randall*

Randall testified in detail about three occasions he claims Mary physically abused him. The first occurred in September 2019. Mary scratched him and broke a chain off his neck. When Randall advised the court he had a video of the incident, the court stated: "If I see the video, it's going to be cumulative and potentially prejudicial. I don't need to see it." The court further advised Randall that he had proven a "prima facie case of abuse."

Randall also described an incident that occurred on January 26, 2020—the couple's anniversary. Mary threw things at him and scratched his arm with five nails. Randall further testified that on March 16, 2020, Mary struck his arm and chest. The trial court declined to view videos of both incidents on the ground they were cumulative.

When the court orally stated the reasons for its rulings, it described in detail the many events the parties testified about

11

and the other evidence it considered. Importantly, the court acknowledged there was evidence that Mary made physical contact with Randall as described by Randall. But the court concluded that under the "totality of the evidence," Mary was acting in self-defense.

While a reasonable judge could have decided that admitting the videos was the better course of action, the court's decision to exclude the videos was not arbitrary, capricious, or patently absurd. The court considered Randall's testimony about Mary's alleged physical abuse and assumed it was accurate. Moreover, the court was justifiably concerned that if they did not finish the hearing on the second day, the matter would be postponed for many months. In a family law action involving child custody and domestic violence claims, such a delay is intolerable. The trial court did not abuse its discretion.

Assuming the trial court erred, there was no miscarriage of justice because Randall has not shown it was reasonably probable that he would have obtained a more favorable result had the trial court admitted the videos into evidence. We reach this conclusion after reviewing all the videos Randall filed with this court.

Randall does not seriously argue there was insufficient evidence for the trial court to issue a DVRO against him or that the trial court abused its discretion in issuing a DVRO under the circumstances presented here. Nor could he. There was substantial evidence that Randall abused Mary within the meaning of the Act. Nothing in the videos changes that analysis.

The same is true with respect to the trial court's denial of Randall's request for a DVRO. Since the court issued a DVRO against Randall, it could have only issued a DVRO against Mary too if it concluded that under the totality of circumstances, she

was also a primary aggressor and she did not act primarily in self-defense.  (*Melissa G.*, *supra*, 27 Cal.App.5th at pp. 367–368; *K.L.*, *supra*, 70 Cal.App.5th at p. 979.)  The videos of the September 2019, January 2020, and March 2020 incidents were insufficient evidence for the trial court to make that finding.

Under a totality of the circumstances, Randall was clearly the only primary aggressor.  Over several years Mary suffered from Randall's relentless harassing and coercive conduct.  She tried to avoid that abuse by avoiding Randall, but Randall would not leave her in peace.  He went so far as to point a gun to his head and threaten to kill himself if she did not submit to his abusive communications.  Even after the court issued a TRO, he kept communicating with Mary in brazen violation of a court order.  That Mary crossed the line by making inappropriate physical contact with Randall on a few isolated occasions during heated arguments does not change the basic nature of the relationship or make Mary a primary aggressor too.

5.    *The legal authorities Randall cites are not persuasive*

In support of his argument that the trial court was required to admit the videos, Randall relies on the Secondary Evidence Rule, codified in Evidence Code sections 1521–1523.  Under this rule, with certain exceptions, oral testimony is not admissible to prove the content of a "writing" (Evid. Code, § 1523, subd. (a)), which is defined by the Evidence Code to include videos.  (*Id.* at § 250.)

The Secondary Evidence Rule has no application here.  Neither party raised an objection at the hearing based on the rule because neither party attempted to prove the content of a video or other writing with oral testimony or other secondary evidence.

13

Moreover, the rule is a ground to *exclude* evidence, and does not compel the *admission* of any writing, including videos.

Randall also cites a host of cases reviewing whether the trial court abused its discretion by *admitting* audio, video, or photographic evidence.[2] These cases do not hold that the trial court was *required* to admit such evidence. Indeed, the cases do not address or consider the argument Randall makes here, namely the trial court abused its discretion by *excluding* the videos.[3]

---

[2] (*People v. Kulwin* (1951) 102 Cal.App.2d 104, 109 [court did not abuse its discretion in admitting tape recordings]; *People v. Cavanaugh* (1955) 44 Cal.2d 252, 268 [use of gruesome photographs was "improper and erroneous"]; *People v. Bowley* (1963) 59 Cal.2d 855, 859 [A film was "properly admitted into evidence"]; *People v. Moran* (1974) 39 Cal.App.3d 398, 411–412 ["The admission of both the photographs and the motion picture was within the sound discretion of the trial court"]; *People v. Patton* (1976) 63 Cal.App.3d 211, 219 [court's admission of tape recording was "proper"]; *Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th 1138, 1146 [videotape should have be excluded because it was not authenticated]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171 [court did not abuse its discretion by admitting videotape]; *People v. Brady* (2010) 50 Cal.4th 547, 581 ["the trial court did not abuse its discretion in admitting this videotape"]; *People v. Guzman* (2019) 8 Cal.5th 673, 682 [tape recording was admissible].)

[3] Randall's reliance on *People v. Richards* (2017) 18 Cal.App.5th 549, 560 (*Richards*) is even more off target. Although the *Richards* court commented on the probative value of a video admitted into evidence, it did not discuss whether the video was admissible.

14

The only cases Randall cites that hold the trial court abused its discretion by excluding evidence are *People v. Cooper* (2007) 148 Cal.App.4th 731 (*Cooper*) and *People v. Miles* (1985) 172 Cal.App.3d 474 (*Miles*). Neither case supports his position.

In *Cooper*, the trial court excluded two videotaped interviews of the victim in a criminal case "on the ground that they violated defendant's right to confront the witnesses against him." (*Cooper*, *supra*, 148 Cal.App.4th at p. 735.) The court held that the defendant's rights under the confrontation clause were not violated and, on that basis alone, reversed an order of dismissal. (*Id.* at pp. 733, 748.)

The present case is distinguishable from *Cooper*. It does not involve analysis of the confrontation clause. Rather, it requires this court to determine whether the trial court abused the discretion it had under Evidence Code section 352, an issue *Cooper* did not consider or address.

In *Miles*, pursuant to Evidence Code section 352, the trial court excluded a police tape recording of a telephone call allegedly made by the defendant in a robbery case. The defendant's defense was mistaken identity and alibi. (*Miles*, *supra*, 172 Cal.App.3d at p. 477.) He claimed that at the time of the robbery, he was at another location, drinking liquor and smoking marijuana. (*Ibid.*) The recording had "substantial probative value" because it corroborated the defendant's testimony that he made the call and that he was intoxicated at the time. (*Id.* at p. 479.) The court held the trial court erroneously excluded the recording and that had the recording been admitted, the defendant's arguments "might well have been successful." (*Ibid.*)

15

This case is distinguishable from *Miles*. The only videos that had more than marginal probative value were those regarding Mary's physical contact with Randall. As to those videos, the court assumed Randall's testimony about the recorded events was true. The *Miles* court, by contrast, did not know whether the jury found the defendant's testimony true.

## B. *The trial court's questioning of Mary*

As is frequently the case in family law litigation, the parties were very emotional and argumentative at the hearing. Both Mary and Randall had to take breaks because they were overcome by emotions. During Mary's testimony the court repeatedly admonished Randall for incivility. Randall gasped and sighed loudly, made inappropriate gestures, held his head with his hands while closing his eyes, argued with Mary and interrupted her answers, shook his head, slapped his hand on the table, laughed at Mary, and accused her of "lying through her teeth."

At one point during Randall's cross-examination, after Mary took a break to collect herself, the court interrupted Randall's line of questioning and began its own questioning. When the court finished, it asked Randall whether there were any other topics he wished the court to inquire about. Randall requested the court to inquire about Mary's mental health, which the court did. After Mary testified that she had not been diagnosed with any emotional or mental disorder that inhibits or impairs her ability to tell the truth, the court declined to ask further questions about the topic.

The court then advised Randall: "If you have other evidence, you can present." Randall subsequently presented additional testimony and other evidence.

Randall argues the court abused its discretion when it took over the cross-examination of Mary. We disagree. The court has the power and duty to "preserve and enforce order in its immediate presence" and to provide "for the orderly conduct of proceedings before it." (Code Civ. Proc., § 128, subds. (a)(1) & (a)(3).) Evidence Code section 765, subdivision (a) provides: "The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment."

Here, Mary was being questioned by Randall, a person who had abused her for years and who was displaying hostile and outright rude behavior toward her at the hearing. Mary needed repeated brakes because she was so upset. By asking Mary questions directly and permitting Randall to ask Mary questions through the filter of the court, the court promoted civility and decorum, protected Mary from undue harassment, and gathered the information it needed as the trier of fact in an efficient way. It committed no error by doing so.

## II. The Trial Court Did Not Commit Reversible Error by Not Issuing a Written Statement of Decision

Judge Michael J. Convey presided over the DVRO hearing. At the time, the parties' marital dissolution action was being handled by another judge in another department—the "home court." Although the parties had filed requests for orders relating to child custody and visitation that were pending in the home court, they agreed that Judge Convey should issue custody and visitation orders on a "temporary basis" until the hearings on the requests for orders. In his DVRO, Judge Convey awarded Mary

17

temporary legal and physical custody of the children and Randall visitation rights.

On August 20, 2011—9 days after the hearing concluded—Randall filed a written request for statement of decision. The request sought a statement of decision on 57 issues, including many issues relating to custody and visitation. The court did not respond to this request.

Randall argues the court was required to provide a statement of decision pursuant to section 3022.3, which states: "Upon the *trial* of a question of fact in a proceeding to determine the custody of a minor child, the court shall, upon the request of either party, issue a statement of the decision explaining the factual and legal basis for its decision pursuant to Section 632 of the Code of Civil Procedure." (Italics added.) Section 3022.3 only applies to a "trial followed by a judgment" and not an order on a motion, even if the motion "involves an evidentiary hearing and the order is appealable." (*City and County of San Francisco v. H.H.* (2022) 76 Cal.App.5th 531, 544.) Since there was no "trial" on child custody and visitation, the court was not required to issue a statement of decision pursuant to section 3022.3.

Randall argues the court erred in not providing a statement of decision pursuant to Code of Civil Procedure section 632. He does not, however, cite authority for the proposition that this statute applies to DVRO hearings. Assuming it does, the court's failure to provide a statement of decision was not reversible error.

A trial court is not required " 'to respond point by point to the issues posed in a request for statement of decision.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.) This is because the permissible scope of a request for statement of

18

decision is quite limited.  A party may only request a statement on "principal controverted issues."  (Code Civ. Proc., § 632.) While the courts have not clearly defined that phrase, "it is settled that the trial court need not, in a statement to decision, 'address all the legal and factual issues raised by the parties.' " (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 (*Yield Dynamics*).)

"A trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts.  A trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence."  (*Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525; accord *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 163.)

Randall's request for statement of decision was overbroad. The court was not required to provide a written statement regarding most, if not all, the 57 issues stated in Randall's request.  Thirty-seven of the issues consisted of questions asking the court to identify the evidence upon which it relied in making certain determinations.  None of  these questions called for findings on ultimate facts.

Many of the remaining issues in Randall's request related to collateral matters wholly unrelated to the issues on appeal. For example, Randall asked the court to "explain the legal basis for granting the spousal support order."  Randall also asked the court whether he engaged "in defense of property" or "in defense of others."

Randall further asked the court to answer inappropriate open-ended questions.  For example, Randall asked:  "How does

19

the custody order protect the [Mary's] safety?"  He also asked: "How does the custody order protect the safety of the [Mary and Randall's] children?"

The trial court was not required to provide a written statement on any of these issues.

In *Yield Dynamics*, the court addressed the propriety of a similar request for statement of decision comprising of 32 questions.  The court opined:  "We do not suppose perfection can fairly be required in the framing of a request for a statement of decision, but neither do we suppose that a trial judge can be required to sift through a host of improper specifications in search of the few arguably proper ones."  (*Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 559.)

We agree with *Yield Dynamics*.  The trial court was not required to sift through Randall's request for statement of decision to determine whether Randall identified any appropriate issues.

Even assuming the trial court erred in not responding to Randall's overbroad request for statement of decision, the error was not prejudicial.  While the court did not state the reasons for its rulings in writing, it did make oral findings about the ultimate facts needed to support its orders.  The court found Mary showed by a preponderance of the evidence that Randall abused her within the meaning of the Act and that Randall did not meet his burden of showing abuse.  Though not required to, the court also discussed the evidence and facts supporting these conclusions.  There was substantial evidence to support each of the court's factual findings.  The court's failure to provide a written statement of decision therefore did not result in a miscarriage of justice.

20

## III. Randall's Claim the Domestic Violence Prevention Act is Unconstitutionally Vague

Randall argues the Domestic Violence Prevention Act is facially unconstitutional because its definition of "abuse" is void for vagueness and overbreadth. In particular, Randall challenges the phrases "disturbing the peace of the other party" and "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subds. (a) & (c).)

A party making a facial challenge to a statute "must carry a heavy burden" because there is a strong presumption that the statute is constitutional and all doubts about its validity must be resolved in favor of upholding the statute. (*People v. Superior Court* (*J.C. Penney Corp., Inc.*) (2019) 34 Cal.App.5th 376, 387 (*J.C. Penney*).)

Not all parties subject to a law can challenge the law based on facial overbreadth and vagueness. (*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 494.) A party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." (*Id.* at p. 495, fn. omitted; accord *J.C. Penney*, *supra*, 34 Cal.App.5th at p. 386 ["the facial challenge fails even if the statute's impact on protected speech triggers a higher standard for clarity, as the statute clearly applies to some of the misconduct alleged in the complaints"].)

Here, Randall engaged in conduct that was clearly prohibited by the Act, including headbutting Mary and pointing a gun to his head, that was, under the totality of the circumstances,

unquestionably harassing and threatening. Randall thus has no standing to argue the Act may be void for vagueness for other parties in different fact patterns. The court will not opine on hypothetical applications of the law that are not presented by the facts of this case.

## DISPOSITION

The orders are affirmed. Respondent Mary A. is awarded her costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TAMZARIAN, J.*

We concur:

MOOR, Acting P.J.

KIM, J.

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.